ORAL ARGUMENT SCHEDULED FOR APRIL 6, 2026

**No. 25-1106**

═══════════════════════════════════════════

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────

THE ESTATE OF STEPHEN M. JENNIONS
*Petitioner*,

v.

COMMODITY FUTURES TRADING COMMISSION,
*Respondent*.

───────────

On Petition for Review of
Final Orders of the Commodity Futures Trading Commission

CFTC Whistleblower Award Determination Nos.
25-WB-02, 25-WB-03, 25-WB-04, 25-WB-05, and 25-WB-06

───────────

**BRIEF FOR PETITIONER
THE ESTATE OF STEPHEN M. JENNIONS**

───────────

Stephen S. Hasegawa
PHILLIPS & COHEN LLP
492 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (415) 836-9000
shasegawa@phillipsandcohen.com

Erika A. Kelton
Samuel E. Brown
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567

*Attorneys for Petitioner The Estate of
Stephen M. Jennions*

February 27, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1.    Parties and Amici**

Petitioner The Estate of Stephen M. Jennions certifies that it is the only party who is seeking review of the Final Orders denying Jennions's claims before this Court. The Respondent is the Commodity Futures Trading Commission. There are no intervenors or amici before the Court.

**2.    Rulings under Review**

Petitioner seeks a review of five final orders issued by the Commodity Futures Trading Commission denying the whistleblower award claims of Stephen M. Jennions. Those orders are CFTC Whistleblower Award Determinations Nos. 25-WB-02, 25-WB-03, 25-WB-04, 25-WB-05, and 25-WB-06, each of which is dated March 12, 2025, and each of which denied Jennions's claims for a whistleblower award. As these five orders are identical, except for the name of the defendant bank, this brief will refer to them collectively as the Commission's "Final Order."

**3.    Related Cases**

This case was not previously on review by this Court or any other court. Petitioner understands that there is a related case currently pending before this Court challenging the same agency final orders on review in this case. That related case is *Trevor Kitchen v. CFTC*, No. 25-1098 (D.C. Cir., filed Mar. 19, 2025).

i

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

GLOSSARY .......................................................................................................... vii

STATEMENT OF JURISDICTION .......................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................2

STATEMENT OF STATUTES AND REGULATIONS .........................................3

STATEMENT OF THE CASE ...............................................................................3

   A.  Introduction .................................................................................................3

   B.  Factual Background .....................................................................................5

       1.     The Banks' Manipulation of a Key Benchmark FX Rate.................5

       2.     Jennions's Report of Manipulation to the United Kingdom's
            Financial Conduct Authority. .............................................................6

       3.     Bloomberg's Publication of an Article Describing the
            Banks' Conduct and the FCA's Confirmation of its
            Awareness of Allegations of the Manipulation. .............................7

       4.     The Commission's Investigation and Recovery of Monetary
            Penalties. ..........................................................................................8

   C.  Procedural Background ................................................................................9

SUMMARY OF ARGUMENT ............................................................................14

STANDING ..........................................................................................................15

STANDARD OF REVIEW ..................................................................................16

ARGUMENT ........................................................................................................17

   A.  Jennions Provided Original Information to the Commission that Led
       to the Commission's Successful Enforcement Action. ............................17

       1.     Jennions provided "original information" to the Commission. ......18

2.      Jennions's original information caused the Commission to open its investigation................................................................20

B.   The Commission's Office of General Counsel Improperly Influenced or Supplanted the Role of the Whistleblower Office, in Violation of Commission Rules............................................................................26

CONCLUSION...........................................................................................31

STATUTORY ADDENDUM……………………………………………….I

# TABLE OF AUTHORITIES

## <u>Cases</u>

*ANR Storage Co. v. FERC*,
  904 F.3d 1020, 1024 (D.C. Cir. 2018)....................................................................17

*Castaneira v. Noem*,
  138 F.4th 540, 551 (D.C. Cir. 2025).....................................................................30

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,
  923 F.2d 188, 194 (D.C. Cir. 1991).....................................................................25

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1, 28 (D.D.C. 2020).....................................................................23

*Doe v. SEC*,
  28 F.4th 1306, 1311 (D.C. Cir. 2022)....................................................................16

*Fox v. Clinton*,
  684 F.3d 67, 74 (D.C. Cir. 2012)....................................................................16

*Johnston v. Sec. & Exch. Comm'n*,
  49 F.4th 569, 575 (D.C. Cir. 2022)....................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29, 43 (1983)............................................................... 16, 23, 25, 26

*Nat'l Env't Dev. Ass'ns Clean Air Project v. Env't. Prot. Agency*,
  752 F.3d 999, 1009 (D.C. Cir. 2014)............................................................ 27, 30

*Panhandle Eastern Pipe Line Co. v. FERC,*
  613 F.2d 1120, 1135 (D.C .Cir. 1979)....................................................................30

*Safe Extensions, Inc. v. F.A.A.*,
  509 F.3d 593, 605 (D.C. Cir. 2007)....................................................................23

## <u>Statutes</u>

5 U.S.C. § 702....................................................................15

5 U.S.C. § 706(2)(A)....................................................................2, 16

7 U.S.C. § 26 (2012) ....................................................................1

7 U.S.C. § 26(b) ..................................................................................................2

7 U.S.C. § 26(b)(1).............................................................................................17

7 U.S.C. § 26(f) ..............................................................................................1, 15

7 U.S.C. § 26(f)(2) ..............................................................................................1

7 U.S.C. § 26(f)(3) ............................................................................................16

Section 23 of the Commodity Exchange Act............................................................1

**Regulations**

17 C.F.R. § 165 *et seq.* (2020) ............................................................................1

17 C.F.R. § 165.2(1) ...........................................................................................19

17 C.F.R. § 165.2(3) ...........................................................................................19

17 C.F.R. § 165.2(i)(1).............................................................................. 17, 25, 26

17 C.F.R. § 165.2(i)(2)..........................................................................................17

17 C.F.R. § 165.2(i)(3)..........................................................................................17

17 C.F.R. § 165.2(k) .............................................................................................18

17 C.F.R. § 165.5(a)..............................................................................................17

17 C.F.R. § 165.7(f)(1) .........................................................................................27

17 C.F.R. § 165.7(f)(2) ................................................................................... 28, 29

17 C.F.R. § 165.7(k) .............................................................................................28

17 C.F.R. § 165.13(a).......................................................................................1, 15

17 C.F.R. § 165.15(a)(2)........................................................................................27

Whistleblower Awards Process,
82 Fed. Reg. 24487 (May 30, 2017) ............................................... 27, 28, 29, 30

Whistleblower Incentives and Protection,
76 Fed. Reg. 53172 (Aug. 25, 2011)......................................................................28

## <u>Other Authorities</u>

Notice of Covered Action No. 2015-010 (JPMorgan Chase Bank, N.A.),
    https://www.whistleblower.gov/notices/2015-010 ...................................................9

Notice of Covered Action No. 2015-011 (The Royal Bank of Scotland plc),
    https://www.whistleblower.gov/notices/2015-011 ...................................................9

Notice of Covered Action No. 2015-012 (HSBC Bank plc),
    https://www.whistleblower.gov/notices/2015-012 ...................................................9

Notice of Covered Action No. 2015-013 (UBS AG),
    https://www.whistleblower.gov/notices/2015-013 ...................................................9

Notice of Covered Action No. 2015-015 (Citibank, N.A.),
    https://www.whistleblower.gov/notices/2015-015 ...................................................9

# GLOSSARY

APA ........................................................................ Administrative Procedure Act

CFTC or Commission .............................. Commodity Futures Trading Commission

CRS ...................................................................................... Claims Review Staff

Dodd-Frank ............. Dodd-Frank Wall Street Reform and Consumer Protection Act

FCA ........................................ The United Kingdom's Financial Conduct Authority

Form WB-APP .................. The CFTC's application form for a whistleblower award

FSA ........................................ The United Kingdom's Financial Services Authority

FX ................................................................................................ Foreign Exchange

OGC .......................................................... The CFTC's Office of General Counsel

NOCA .......................................................................... Notice of Covered Action

TCR .............................................................. Form TCR: Tip, Complaint, Referral

WM/R Rates ............................................ World Market/Reuters Closing Spot Rates

## STATEMENT OF JURISDICTION

The Commodity Futures Trading Commission had subject matter jurisdiction pursuant to Section 23 of the Commodity Exchange Act, 7 U.S.C. § 26 (2012) and the Commission's Whistleblower Rules, 17 C.F.R. § 165 *et seq.* (2020) to review Jennions's application for a whistleblower award.

This Court has jurisdiction over the Petition pursuant to 7 U.S.C. § 26(f)(2) and 17 C.F.R. § 165.13(a).

Petitioner timely filed this petition for review on April 10, 2025, within thirty days after the Commission issued its final orders, on March 12, 2025.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the Commission's finding that Jennions's original information did not lead to the successful enforcement of the covered action under 7 U.S.C. § 26(b) was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

2.      Whether the participation of the Commission's Office of General Counsel in the Commission's final agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

2

## STATEMENT OF STATUTES AND REGULATIONS

In accordance with Local Rule 28(C)(5), the relevant statutes and regulations are included in the Statutory Addendum bound to this brief.

## STATEMENT OF THE CASE

### A.    Introduction

Stephen Jennions[1] uncovered a long-running scheme by major banks across London and New York to manipulate an important foreign exchange benchmark rate for their own profit. He first brought the misconduct to the attention of the United Kingodom's Foreign Conduct Authority ("FCA")[2] while the manipulation remained unknown to regulators and the broader public. Based on his information, the FCA began sending inquiries to these banks, asking about their trading practices, causing the banks to then conduct their own internal investigations. The FCA's inquiries ultimately led to an article in Bloomberg, which described the banks' alleged manipulation—*i.e.*, the original information that Jennions provided

---

[1] The whistleblower, Stephen Jennions, died during the pendency of the administrative proceedings. His claims are being pursued by his estate. For simplicity, this brief will use "Jennions" to refer to both Stephen Jennions and his estate.

[2] In January 2013, the Financial Services Authority ("FSA") was the United Kingdom's financial regulator, but, in April 2013, the FSA was restructured and replaced, in part, by the FCA. For ease of reference, "FCA" will be used in this brief to refer to both the FSA and the FCA.

to the FCA—and revealed that the FCA was aware of the misconduct and was speaking to the banks about it.

The Bloomberg article—and Jennions's original information in it—prompted the Commodity Futures Trading Commission (the "Commission") to begin its own investigation, while collaborating with the FCA. That investigation led to the Commission's successful enforcement action and recovery of $1.4 billion in penalties against the banks.

Jennions submitted his information to the Commission under the Commission's whistleblower provisions, and, after the Commission's recovery of penalties, applied to the Commission for a whistleblower award. In a shifting series of explanations, the Commission first claimed that it began its investigation after learning of the banks' internal investigations, later admitted that the Bloomberg article prompted the Commission's investigation, and, finally—but without record support—argued that it commenced its investigation in reliance upon some selected portions of the Bloomberg article, but not the ones reporting Jennions's original information. On that latter basis, the Commission issued Final Orders denying Jennions's application for a whistleblower award, asserting that none of Jennions's "original information" (including Jennions's information reported in the Bloomberg article) caused it to commence an investigation or otherwise aided that investigation.

That result is unfair, refuted by the record, and contrary to law. The uncontroverted record demonstrates that Jennions was responsible for exposing the banks' manipulation, for which the Commission ultimately recovered $1.4 billion in penalties. Jennions's original information led to the Commission's recovery, and he submitted his information to the Commission in accordance with the Commission's whistleblower rules. Yet the Commission, under a shifting series of explanations, has sought to exclude Jennions from the reward to which the Dodd-Frank Act entitles him. Jennions respectfully submits that the Court should correct that error and right that wrong.

### B.    Factual Background

#### 1.    The Banks' Manipulation of a Key Benchmark FX Rate

For years, foreign currency traders at more than a dozen major banks colluded in a scheme to manipulate the World Market/Reuters Closing Spot Rates ("WM/R Rate"), the most widely referenced benchmark rate within the multi-trillion-dollar global foreign exchange markets. SJ_ROA0000014, 232. The financial industry relies on that benchmark to price financial instruments and settle financial contracts. SJ_ROA0000014, 232. The impact of the banks' rate manipulation was immense, affecting the execution prices of countless foreign exchange transactions as well as the values of equity indices, bond indices, and derivative instruments linked to the rate. SJ_ROA0000015. Until Jennions blew

the whistle, this manipulation allowed the banks to obtain massive profits, secretly, at the expense of innocent participants in the financial markets. *Id.*; SJ_ROA0000232.[3]

### 2. Jennions's Report of Manipulation to the United Kingdom's Financial Conduct Authority.

On January 7, 2013, Jennions ("Claimant 5" in the Commission's Final Order) voluntarily provided extensive detailed information to the United Kingdom's Financial Conduct Authority ("FCA") concerning the banks' manipulation of the relevant foreign exchange benchmark rate. SJ_ROA0000079, 329. It is undisputed that neither the FCA nor the Commission was aware of this manipulation until Jennions reported it to the FCA. SJ_ROA0000329, 476. Jennions met with the FCA on February 5, 2013, and provided further information to the FCA in April and November 2013. SJ_ROA0000082-97, 330.

"[A]s a result" of Jennions's information, the FCA's Supervision Division "began to make enquiries and request information from market participants. This work progressed over the summer and into the autumn of 2013." SJ_ROA0000329. According to the FCA itself, "[t]he information [Jennions] provided to the FCA in

---

[3] Because each of the five agency orders that Jennions is contesting is based on an identical order and administrative record, save for the name of the bank, the record on appeal contains five identical copies of many of the relevant documents. When there are five copies of the same document, Jennions will cite to only a single copy of that document to simplify the citations.

6

January and February 2013 was the cause of [its] initial enquiries to market participants," which began in February 2013. SJ_ROA0000329-330.

After the FCA began investigating Jennions's information, the target banks initiated their own internal investigations into potential manipulation of the relevant foreign exchange benchmark rate. SJ_ROA0000329.

### 3. Bloomberg's Publication of an Article Describing the Banks' Conduct and the FCA's Confirmation of its Awareness of Allegations of the Manipulation.

On June 12, 2013, in the wake of the FCA's inquiries and the target banks' subsequent internal investigations, Bloomberg published an online news article headlined "Traders Said to Rig Currency Rates to Profit Off Clients." SJ_ROA0000234-240. The article described how FX traders at banks across the industry were colluding to rig the WM/R benchmark. *Id.*

Bloomberg attributed some of the information in its article to "five [anonymous] dealers with knowledge" of the manipulation scheme, later describing those dealers as "traders." SJ_ROA0000234. Another source of the information in the Bloomberg article was the FCA, who stated that it was "aware of these allegations"—*i.e.*, of Jennions's factual allegations of the banks' manipulation of the relevant foreign exchange benchmark rate, the same conduct described in the article—"and has been speaking to the relevant parties." SJ_ROA0000235.

7

> **4.** **The Commission's Investigation and Recovery of Monetary Penalties.**

The Commission formally opened its investigation on June 13, 2013, the day after Bloomberg published its article. SJ_ROA0000443 ¶ 3.

On June 18, 2013, two Commission staff spoke with the FCA and learned that its Supervision Division was inquiring about the precise misconduct at issue and evaluating trades that may have influenced benchmark exchange rates. SJ_ROA0000235, 329, 443 ¶ 3. The day after speaking to the FCA, the Commission assigned a team to the case and began investigating the Banks' manipulation. SJ_ROA0000443 ¶ 4. In reliance on the FCA's quote in the Bloomberg article, one of the first steps taken by Commission Enforcement Division staff ("Enforcement Staff") upon being assigned the investigation was to "reach out to the FCA." *Id.*

The Commission continued its investigation through 2013 and 2014, collaborating with the FCA throughout the process. SJ_ROA0000228-230, 443-444.

On November 12, 2014, the Commission ordered the Banks to pay more than $1.4 billion in penalties for the manipulation that Jennions first brought to the attention of the FCA. *See, e.g.*, SJ_ROA0000232. The conduct resulting in the collection of those penalties was the precise conduct that Jennions had disclosed to the FCA: the banks' manipulation of the WM/R Rate. *Id.*

In February 2015, the Commission posted the following notices of covered actions ("NOCA") for enforcement actions against five banks, inviting members of the public to apply for whistleblower awards related to those actions:

- Notice of Covered Action No. 2015-010 (JPMorgan Chase Bank, N.A.), https://www.whistleblower.gov/notices/2015-010.

- Notice of Covered Action No. 2015-011 (The Royal Bank of Scotland plc), https://www.whistleblower.gov/notices/2015-011.

- Notice of Covered Action No. 2015-012 (HSBC Bank plc), https://www.whistleblower.gov/notices/2015-012.

- Notice of Covered Action No. 2015-013 (UBS AG), https://www.whistleblower.gov/notices/2015-013.

- Notice of Covered Action No. 2015-015 (Citibank, N.A.), https://www.whistleblower.gov/notices/2015-015.

## C.    Procedural Background

On February 12, 2015, Jennions submitted a Form TCR (the form the Commission's rules prescribe for whistleblower submissions), containing information about the banks' misconduct and his provision of information to the FCA. SJ_ROA0000001-38, 230 ¶ 23. On April 30, 2015 and October 16, 2015, Jennions submitted Forms WB-APP (the forms the Commission's rules prescribe for applications for whistleblower awards) describing his eligibility for and entitlement to a reward under the Commission's whistleblower statute and rules, including his provision of information to the FCA. SJ_ROA0000057-107, 108-136.

9

On April 22, 2016, the Commission sent Jennions a letter stating that it intended to deny his award application on the ground that the information he provided to the Commission did not lead to its successful enforcement action. SJ_ROA0000313-315. The Commission's letter did not mention the Bloomberg article at all. *Id.* Instead, the Commission asserted that the banks "undertook their own internal investigations into Currency FX trading prior to the Division's investigation," and provided the Commission with important information and analysis that led to the Commission's recovery. SJ_ROA0000313-314.

On June 22, 2016, Jennions asked the Commission to reconsider its decision. SJ_ROA0000316-332. Jennions set forth facts demonstrating that his whistleblower activity with the FCA caused the banks to undertake internal investigations and report those results to the Commission, thus leading to the successful enforcement action. *Id.* In support of his request, Jennions supplied a letter from the FCA confirming that it did not know of the banks' misconduct prior to his report and describing his significant contribution to the FCA's investigation. SJ_ROA0000329-331. Jennions supplemented his request for reconsideration on July 31, 2017. SJ_ROA0000333-342.

On February 23, 2022, the Commission issued a series of Preliminary Determinations (one for each bank from which it obtained a recovery), recommending that Jennions be denied any whistleblower award. *See, e.g.,*

10

SJ_ROA0000344-357. The Preliminary Determinations were based on a Declaration submitted by the Chief Trial Attorney (the "Declarant") who led the team that investigated the banks' manipulation. *See, e.g.*, SJ_ROA0000223-231. The Declarant stated that a "news article"—the Bloomberg article, attached to the declaration—"caused the division to open the investigation." SJ_ROA0000224 ¶ 3. The Declarant did not assert that the Commission relied upon any particular information within the Bloomberg article or that the Commission disregarded any of the information in that article. *See, e.g.*, *id.*

Jennions requested, and, on March 24, 2022, the Commission provided, an opportunity to review the record on which the Commission purported to rely in reaching the Preliminary Determinations. SJ_ROA0000426, 428-429. On April 11, 2022, Jennions informed the Commission that the record was deficient and asked for additional information required to complete the record, as well as confirmation that the Office of General Counsel ("OGC") did not exert undue influence on the Claims Review Staff ("CRS") in reaching the Preliminary Determinations. SJ_ROA0000431-432. The Commission denied Jennions's request to supplement the record. SJ_ROA0000434. Jennions renewed his request and the Commission again denied it. SJ_ROA0000436-438, 440-441.

On May 20, 2022, Jennions objected to the Commission's Preliminary Determination denying him an award. SJ_ROA0000407-41. Jennions explained

11

that the Bloomberg article reported his original information—of which he was an original source, and the same original information included in Jennions's TCR—including the FCA's confirmation that it was aware of and conducting inquiries concerning the allegations of manipulation reported in the article, thus corroborating the statements of the article's other sources. SJ_ROA0000415-17. Jennions also argued that the administrative record was incomplete and that the OGC violated Commission regulations by usurping the role of the Office of the Whistleblower in the claims review process. SJ_ROA0000419-24.

On March 12, 2025, the Commission issued Final Orders denying an award to Jennions. *See, e.g.*, SJ_ROA0000473-485. The sole bases in the Final Orders for the Commission's denial of an award to Jennions were that Jennions "Did Not Cause the Commission to Open the Investigation" and that his Form TCR "Did Not Significantly Contribute to the Action and Related Actions."[4] SJ_ROA0000479-483. As to the former, the Final Orders argued, without citation to or support in the administrative record, that only some specific information in the Bloomberg article—descriptions of manipulation attributed to "traders," but not the FCA's statement that it was already aware of that misconduct or its inquiries to banks regarding it—prompted the opening of the Commission's investigation. *See, e.g.*, SJ_ROA0000481. The Declarant provided a supplemental

---

[4] In this appeal, Jennions challenges only the first of these two bases.

declaration again stating that the Bloomberg article (and not any specific information in it) caused the Commission to open its investigation. *See, e.g.*, SJ_ROA0000442-445; *id.* at SJ_ROA0000443 ¶ 3.

Jennions timely filed his Petition for Review on April 10, 2025.

## SUMMARY OF ARGUMENT

Jennions voluntarily provided the same original information to both the FCA and the Commission describing a years-long manipulation scheme coordinated by currency traders across many of the world's largest banks. He is entitled to a whistleblower award because his original information, as reported in the Bloomberg article, caused the Commission to open its investigation into the manipulation and led to the Commission's successful enforcement actions against the banks. The Commission's denial of Jennions's whistleblower award applications was arbitrary and capricious.

First, the Commission acted arbitrarily, capriciously, and contrary to law in finding that Jennions was ineligible for an award because his original information did not lead to its successful enforcement action. Original information leads to the successful enforcement of an action if, among other alternatives, it causes the Commission to open the investigation that leads to a successful action. The record establishes that the Bloomberg article as a whole, and not any specific information in it, caused the Commission to open the investigation that led to its recovery of $1.4 billion. That article included Jennions's "original information": the FCA's acknowledgement of its awareness of "these allegations" is a statement by the FCA corroborating allegations of the benchmark-rate manipulation detailed elsewhere in the article, and the record clearly shows that the FCA's statement was a summary

14

of the original information that Jennions had provided to it. Similarly, the FCA's confirmation that it was "speaking to the relevant parties" about the manipulation was a reference to the inquiry it began in reliance upon Jennions's original information. Accordingly, the Commission's concession that the Bloomberg article as a whole—and not any specific information in it—caused it to open an investigation is an admission that Jennions's original information was, at least in part, the precipitating cause of the opening of the investigation. The Commission's belated attempt to argue that it relied only upon selective information in the Bloomberg article is both contrary to the record and implausible.

Second, the Commission violated its own regulations governing the claims review process by removing the Whistleblower Office from its assigned role, which included analyzing Jennions's eligibility for an award, and inserting OGC in its place. The Commission offered no explanation for why it chose to surreptitiously alter its procedures in Jennions's case, but in doing so, it acted contrary to law.

## STANDING

Jennions has standing for this appeal under 7 U.S.C. § 26(f), 17 C.F.R. § 165.13(a), and 5 U.S.C. § 702 as a person aggrieved by the CFTC's decision to deny his whistleblower award application.

15

## STANDARD OF REVIEW

Under 7 U.S.C. § 26(f)(3), the Commission's final decisions denying whistleblower award applications are reviewed under Section 706 of the APA and shall be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Doe v. SEC*, 28 F.4th 1306, 1311 (D.C. Cir. 2022).

An agency decision is "arbitrary and capricious if [it] has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012) (quoting *State Farm's* arbitrary and capricious standard with respect to informal adjudication). To meet this standard, the Commission "must have examined the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Johnston v. Sec. & Exch. Comm'n*, 49 F.4th 569, 575 (D.C. Cir. 2022) (internal quotations omitted).

During its review, the Court must therefore "focus on the reasons stated in the orders under review," without supplying its own reasoning for the agency

16

decision or considering "the agency's post-hoc rationalizations." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (internal quotes and citations omitted).

## ARGUMENT

### A. Jennions Provided Original Information to the Commission that Led to the Commission's Successful Enforcement Action.

The Commission "shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action." 7 U.S.C. § 26(b)(1); *see also* 17 C.F.R. 165.5(a). A whistleblower's original information "led to the successful enforcement of a judicial or administrative action" if, among other alternatives:

> the whistleblower gave the Commission original information that was sufficiently specific, credible, and timely to cause the Commission staff to commence an examination [or] open an investigation … and the Commission brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of the whistleblower's original information.

17 C.F.R. § 165.2(i)(1).[5]

Thus, under 17 C.F.R. § 165.2(i)(1), Jennions is eligible for an award if he satisfies three requirements: (1) he gave the Commission "original information" in

---

[5] There are two other alternative means of satisfying the "led to the successful enforcement" test. 17 C.F.R. §§ 165.2(i)(2), (3). Jennions does not rely, in this appeal, upon either of those alternative tests.

a Form TCR; (2) his original information was "sufficiently specific, credible, and timely to cause the Commission staff to … open an investigation"; and (3) the Commission "brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of the whistleblower's original information."

The Commission does not appear to dispute that it "brought a successful … administrative action based in whole or in part on conduct that was the subject of [Jennions's] … information." The undisputed facts demonstrate that each of the remaining two criteria is satisfied here.

### 1. Jennions provided "original information" to the Commission.

"Original information," in relevant part, is information that:

(1) is derived from the independent knowledge or independent analysis of a whistleblower; (2) is not already known to the Commission from any other source, unless the whistleblower is the original source of the information; (3) is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information; [and] (4) is submitted to the Commission for the first time after July 21, 2010 ….

17 C.F.R. § 165.2(k).

Jennions submitted a Form TCR to the Commission on February 12, 2015. SJ_ROA0000013-38. The Commission's Final Order does not dispute that the

18

information in Jennions's Form TCR constituted "original information."[6]

SJ_ROA0000479-485. In other words, the undisputed record establishes that: (1)

the information Jennions provided in that Form TCR was derived from his

independent knowledge or independent analysis; (2) to the extent that information

was already known to the Commission, Jennions was its original source, as defined

by 17 C.F.R. § 165.2(1); (3) Jennions's information was not derived from any

improper source; and (4) it was submitted after July 21, 2010.

The information in Jennions's TCR was the same information that he

supplied to the FCA in January 2013, the same information that spurred the FCA to

send inquiries to the banks, and the same information that the FCA referenced

when informing Bloomberg that it was "aware of these allegations [of

manipulation]." *See* SJ_ROA000001-38, 64-71, 79-97, 329. Accordingly, both the

---

[6] The Preliminary Determination argued that Jennions was not the "original source" of information obtained from the FCA or from the Bloomberg article (as distinguished from information in Jennions's TCR). SJ_ROA 0000354-355 ¶¶ 22-23. The Final Order, however, does not adopt that argument. Nor does the Final Order assert that Jennions's Form TCR failed to provide any "original information" to the Commission. Instead, the sole basis for the Final Order's denial of Jennions's claims for an award is that his original information purportedly did not cause the opening of an investigation or aid the investigation. SJ_ROA0000479-482. Arguments raised in the Preliminary Determination but not adopted in the Final Orders are not part of the asserted basis for the denial, and the Commission has waived or abandoned any argument that Jennions's Form TCR did not provide any "original information" to the Commission.

19

information Jennions provided to the Commission and the information he provided to the FCA constituted the same "original information," as that term is defined by the Commission's whistleblower rules.

### 2. Jennions's original information caused the Commission to open its investigation.

The Commission denied Jennions's claim for an award on the ground that his original information did not "lead to the successful enforcement of the Covered Action." SJ_ROA0000479-482. The Commission's position is that the Bloomberg article—and not Jennions's original information—"caused the opening of the investigation." SJ_ROA0000479.

But that position ignores the fact that Jennions's original information, through the FCA, was included in the Bloomberg article—a fact the Commission acknowledged in its Final Order. *Id.* The Commission agreed that the FCA was a source of information "reported in the Bloomberg article" and that the FCA's corroborative statement concerning its knowledge of allegations of manipulation of the relevant foreign exchange benchmark rate was "[b]ased on Claimant 5's information." *Id.*

The Bloomberg article reported the same information that Jennions provided to the FCA and later included in his TCR: that a group of traders associated with several banks allegedly was colluding to manipulate a benchmark FX rate. *See* SJ_ROA0000007-19, 79-97, 234. It further reported that the FCA was "aware of

20

these allegations." SJ_ROA0000235. According to the FCA itself, the FCA's corroborative statement that it was "aware of these allegations" was a reference specifically to the original information that Jennions had provided to the FCA. SJ_ROA0000329-330 ("This statement [in the Bloomberg article] referred to the ongoing supervisory work which we [the FCA] started based on the information you provided to us"); SJ_ROA0000330 ("[t]he information [Jennions] provided to the FCA was the cause" of the inquiries reported in the Bloomberg article). Thus, the Bloomberg article both reported Jennions's original information (his allegations of manipulation, provided through the FCA) and indicated that that information was the same as the information reported elsewhere in the article ("these allegations"). In addition, the article reported what the FCA was doing in response to Jennions's original information: "speaking to the relevant parties." SJ_ROA0000235.

Accordingly, at least some of the information in the Bloomberg article was Relator's original information, provided to Bloomberg through the FCA.[7] Indeed,

---

[7] Moreover, the Commission has not contradicted the record evidence that *all* of the information in the Bloomberg article resulted from Jennions's original information. The FCA stated that various banks "initiated internal investigations" in response to three events: (1) the FCA's initial inquiries; (2) the Bloomberg article; and (3) the formal FCA Enforcement investigation that followed both the FCA's initial inquiries and the Bloomberg article. SJ_ROA0000330. Thus, although the article did not say so explicitly, it appears from the timing and the content of the article that Bloomberg learned of the banks' manipulation from traders who either were aware of the FCA's inquiries (prompted by Jennions's

21

the information in the Bloomberg article attributed to the FCA is inextricable from the information attributed to others. All of the information describes the same conduct—several banks' manipulation of a benchmark rate—as described by multiple sources, including traders and one regulator. Since the Commission acknowledged that the Bloomberg article caused the opening of its investigation, and the Bloomberg article reported Relator's original information (inextricable from other corroborating sources), Relator's original information necessarily caused the opening of the investigation.

The Commission's Final Order, however, argues that the information the Bloomberg article attributed to the FCA was immaterial to its decision to open an investigation. ROA0000479-80 (minimizing information about FCA's inquiry), ROA0000481 ("The Commission commenced the investigation based on the specific explanation of how the traders were manipulating rates, not that the FCA was 'aware of the allegations.'"). The Commission's argument suffers from two insuperable flaws.

First, it is utterly unsupported by the record, and is no more than a *post hoc* rationalization. The Commission's Declarant twice testified that the Commission opened the investigation on the basis of the Bloomberg article as a whole, not on

---

report to the FCA) or of the banks' internal investigations (prompted by the FCA's inquiries). While the Commission speculates otherwise, it has not offered any contradictory evidence to support its implausible argument.

the basis of any particular information in it. SJ_ROA0000224 ¶ 3 (referring to Bloomberg article as "the news article that caused the Division to open the investigation"); SJ_ROA0000443, ¶ 3 (Commission opened an investigation "based on a news article [the Bloomberg article] …."). Nothing in the record states or suggests that the Commission opened the investigation on the basis of particular information in that article or that the Commission disregarded the article's corroborative references to the FCA's awareness of the banks' manipulation of the relevant benchmark rate (Jennions's original information) or the FCA's inquiries based on that information. The Commission has cited nothing in the record to the contrary. "An agency's declaration of fact that is capable of exact proof but is unsupported by any evidence is insufficient to make the agency's decision non-arbitrary." *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 605 (D.C. Cir. 2007) (internal quotes and citations omitted); *see also D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 28 (D.D.C. 2020) (finding agency rule "arbitrary and capricious" when, *inter alia*, underlying factual assertion was "not a finding supported by facts"). Because the Commission's asserted basis for denial of Jennions's claim "runs counter to the evidence before the agency," it is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Second, the Commission's argument that it ignored the Bloomberg article's references to the FCA's knowledge and activity is simply not plausible. While an

23

article describing illegal conduct might be sufficient to prompt an investigation, a foreign regulatory body's statement that it is independently aware of that misconduct (based, in this case, on Jennions's original information) and is following up on it with additional inquiries to the "relevant parties" unquestionably adds weight to the article's reporting. It corroborates the article's details, it does so through a government investigatory agency not subject to the same credibility questions as the anonymous sources on which the article otherwise relied, and it shows that the FCA believed the allegations sufficiently reliable to undertake follow-up action. That information could not have escaped the attention of Commission staff who saw the Bloomberg article. As the Commission itself recognizes, "a specificity and credibility determination must be made by the Commission staff at the time" of the decision to open the investigation. SJ_ROA0000481. The fact that a foreign regulator was already inquiring into the banks' manipulation could only enhance the credibility of that information. Thus, once Commission staff read the article, none of the information in it could be disentangled from the rest.

Indeed, the Commission's actions immediately after opening its investigation demonstrate that it viewed the FCA's involvement as significant. The first step the Commission took on June 12, 2013, before even assigning a team to the investigation, was for two Commission staff members to call the FCA.

24

SJ_ROA0000443 ¶ 3. When a team was assigned to the investigation the following day, "one of the first things that [the] team did when [they] were assigned the matter was reach out to the FCA." *Id.* ¶ 4. Although the Commission argues that the information attributed to the FCA was unimportant to its decision to open an investigation, the fact that the Commission made outreach to the FCA its top priority demonstrates that that argument is merely *post hoc* rationalization. *See City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (rejecting agency's *post hoc* rationalization that lacked any support in the record). In short, the Commission's unsupported assertion that it was moved only by the statements attributed to "traders," and not by the FCA's confirmation that it had received and was acting upon Jennions's original information, is "so implausible" that it renders the FCA's action arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Finally, the Commission maintains that Jennions's original information could not cause the Commission to open its investigation because the Commission did not make an independent determination that his information was sufficiently "specific and credible" to do so. SJ_ROA0000481-482. But 17 C.F.R. § 165.2(i)(1) does not require two separate determinations, one as to whether information is "specific and credible" and a separate determination as to whether that information caused the Commission to open an investigation. Instead, it requires that

25

information be "sufficiently specific, credible, and timely to cause the Commission staff to … open an investigation." *Id.* The Commission's decision to open an investigation on the basis of a whistleblower's information necessarily establishes that the whistleblower's information was "sufficiently specific, credible, and timely" to prompt that action. *Id.* The Commission's position that these are two independent inquiries could lead to the absurd result that a whistleblower's tip could actually cause the Commission to open an investigation yet separately be deemed by the Commission not sufficiently specific, credible, or timely to do so. Moreover, at the time that the Commission opened its investigation, it was aware from the Bloomberg article that the information in the FCA's possession was sufficiently "specific and credible" for the FCA to begin inquiring about the conduct. SJ_ROA0000443 ¶¶ 3-4. The Commission's argument to the contrary is arbitrary and capricious because it both "runs counter to the evidence before the agency" and is contrary to law. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

> **B.    The Commission's Office of General Counsel Improperly Influenced or Supplanted the Role of the Whistleblower Office, in Violation of Commission Rules.**

In his objection to the Preliminary Determination, Jennions argued that the Commission's decision was improperly influenced by the Office of General Counsel ("OGC"), which appeared to have exercised undue control over the Claims Review Staff (the "CRS") and the claims review process.

26

SJ_ROA0000423. The Commission responded that "[w]hile the Rules contemplate that typically the Whistleblower's Office would be assisting the CRS in their claims, the Commission has the authority to reassign roles, as appropriate." SJ_ROA0000485. With this response, the Commission acknowledges, or at least does not dispute, that OGC supplanted the Whistleblower Office during the claims review process. This violation of the Commission's own regulations governing the whistleblower award process is grounds for reversal. *Nat'l Env't Dev. Ass'ns Clean Air Project v. Env't. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("an agency is bound by its own regulations … [an] agency is not free to ignore or violate its regulations while they remain in effect.") (cleaned up).

Commission regulations directly assign specific responsibilities for administering the whistleblower awards process to various Commission Offices and staff. *See* Whistleblower Awards Process, 82 Fed. Reg. 24487, 24492 (May 30, 2017). Pursuant to those rules, the CRS—not OGC—must evaluate all whistleblower award claims. 17 C.F.R. § 165.7(f)(1). The CRS "shall be composed of no fewer than three and no more than five staff members from any of the Commission's Offices or Divisions (except the office of the General Counsel) …." 17 C.F.R. § 165.15(a)(2). Thus, the Commission's regulations expressly preclude OGC from participation in the CRS. Instead, per the Commission's rules, OGC's only role is to review the CRS's award decision for legal sufficiency. 17 C.F.R.

§ 165.7(k). In addition, the Commission assigned to the Whistleblower Office (not OGC) the role of assisting the CRS in compiling the factual record and analyzing a claimant's eligibility for an award. *See* 17 C.F.R. § 165.7(f)(2); Whistleblower Awards Process, 82 Fed. Reg. at 24491.

The Commission's claim that it has authority to reassign roles prescribed by regulation is false, both factually, as a description of the whistleblower award procedure, and as a matter of law, and the Commission conspicuously declined to cite any authority for this proposition or to explain why a reassignment was "appropriate" in Jennions's case. SJ_ROA0000485.

The Commission's own comments when enacting the regulations governing the current review process directly contradict its current position that the rules are mere suggestions. The Commission first promulgated rules in 2011 to establish "a regulatory framework for the whistleblower program." Whistleblower Awards Process, 82 Fed. Reg. at 24487.  Those initial rules delegated broad authority—the kind the Commission is now claiming—to the Whistleblower Office to run the whistleblower program and to a Whistleblower Award Determination Panel to make award decisions. Whistleblower Incentives and Protection, 76 Fed. Reg. 53172, 53191, 53207 (Aug. 25, 2011).

The Commission, however, later decided that this discretionary structure was failing, and "the need for certain improvements has become apparent."

28

Whistleblower Awards Process, 82 Fed. Reg. at 24487.  The Commission

concluded that, instead of delegating broad authority to a panel to confer awards, it

would create a new claims review process that would "better define and specify

each step in the process." *Id.* at 24489.

Accordingly, through notice-and-comment rulemaking, the Commission

added paragraphs (f) through (l) to Rule 165.7, assigning specific roles to various

Commission staff and offices. *Id.* With intention, and after soliciting public

feedback, the Commission replaced the Whistleblower Award Determination Panel

with "a review process handled by a Claims Review Staff . . ., with the Claims

Review Staff being assisted by the Whistleblower Office staff within the Division

of Enforcement." *Id.* The Commission also specified the duties of the

Whistleblower Office staff while assisting the CRS, which include "assembl[ing]

the factual record related to an award claim, provid[ing] analysis of an award

claimant's eligibility and, if applicable, mak[ing] a recommendation of a proposed

award amount." *Id.* at 24491; *see also* 17 C.F.R. § 165.7(f)(2). The Commission's

purpose in clearly defining the review steps and delineating the roles of

Commission Offices in the process was to "provide the public and claimants with

greater transparency in the awards claim review process and enhance the

expeditious and fair administration of the program." Whistleblower Awards

Process, 82 Fed. Reg. at 24490.  The Commission's current assertion that it can

29

mix and match the roles in the claims review process and reassign them at will cannot be squared with the care the Commission took in delineating the process or with the stated purpose of providing claimants with increased transparency.

The Commission's claim, moreover, fails as a matter of law. An agency must abide by the rules it enacts and may not "play fast and loose with its own regulations." *Nat'l Env't Dev. Assoc.'s Clean Air Project*, 752 F.3d at 1009 (quoting *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1135 (D.C. Cir. 1979)). "This fundamental principle remains true even for gratuitous procedural rules that limit otherwise discretionary actions." *Castaneira v. Noem*, 138 F.4th 540, 551 (D.C. Cir. 2025) (internal quotes and citations omitted). If an agency "chooses to bind itself to published procedures, this choice means that it must then exercise its own discretion in accordance with its own existing valid regulations." *Id.* (internal quotes and citations omitted).

This Commission's disregard of its own regulations is not a mere technicality, but impacts the substance of the Commission's decision. The Whistleblower Office is tasked with helping the CRS by "provid[ing] analysis of an award claimant's eligibility," and it is precisely this analysis of Jennions's eligibility that is now in dispute. Whistleblower Awards Process, 82 Fed. Reg. at 24491. The Commission's concession that OGC usurped the role of the

30

Whistleblower office, in violation of its own regulations, renders its decision arbitrary and capricious.

## CONCLUSION

Jennions provided original information to the Commission which led to the Commission's successful enforcement actions. This Court should grant the petition for review, vacate the Commission's final orders, and remand to the Commission for determination of the amount of an appropriate whistleblower award.

In the alternative, the Commission's denials of Jennions's whistleblower award application were in violation of Commission regulations. This Court should vacate the Commission's final orders and remand to the Commission to reconsider using the correct procedure.

Date: February 27, 2026    Respectfully submitted,

/s/ *Stephen S. Hasegawa*
Stephen S. Hasegawa
PHILLIPS & COHEN LLP
492 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (415) 836-9000
shasegawa@phillipsandcohen.com

Erika A. Kelton
Samuel E. Brown
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
ekelton@phillipsandcohen.com
sbrown@phillipsandcohen.com

31

*Attorneys for Petitioner The Estate of*
*Stephen M. Jennions*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,791 words, according to the word-count function of Microsoft Office Word, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and this Court's Rule 32(e)(1).

I also certify that this brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)(A) and 32(a)(6) because it has been prepared using Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Stephen Hasegawa
Stephen Hasegawa
PHILLIPS & COHEN LLP
492 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (415) 836-9000
shasegawa@phillipsandcohen.com

## CERTIFICATE OF SERVICE

I certify that on February 27, 2026, I electronically filed the foregoing Brief for Petitioner The Estate of Stephen M. Jennions using the CM/ECF system, which constitutes electronic service upon all counsel of record.

/s/ Stephen Hasegawa
Stephen Hasegawa
PHILLIPS & COHEN LLP
492 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (415) 836-9000
shasegawa@phillipsandcohen.com

**STATUTORY ADDENDUM**

**STATUTES**

### 5 U.S.C. § 702

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

### 5 U.S.C. § 706(2)

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

I

    (D)  without observance of procedure required by law;

    (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 7 U.S.C. § 26(a)(4)

(a)    Definitions

In this section:

(4) Original information

The term "original information" means information that--

    (A)  is derived from the independent knowledge or analysis of a whistleblower;

    (B)  is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and

    (C)  is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information.

## 7 U.S.C. § 26(b)

(b)    Awards

(1) In general

In any covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to

subsection (c), shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action, in an aggregate amount equal to--

    (A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and

    (B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions.

### 7 U.S.C. § 26(f)

(f)    Appeals

    (1) In general

    Any determination made under this section, including whether, to whom, or in what amount to make awards, shall be in the discretion of the Commission.

    (2) Appeals

    Any determination described in paragraph (1) may be appealed to the appropriate court of appeals of the United States not more than 30 days after the determination is issued by the Commission.

    (3) Review

    The court shall review the determination made by the Commission in accordance with section 70642 of Title 5.[8]

---

[8] So in original. Probably should be "section 706".

III

**REGULATIONS**

**17 C.F.R. § 165.2(i)(1); (k); (l)(1)**

As used in this part:

(i)    **Information that led to successful enforcement.** The Commission will consider that the whistleblower provided original information that led to the successful enforcement of a judicial or administrative action, or related action, in the following circumstances:

    (1)    The whistleblower gave the Commission original information that was sufficiently specific, credible, and timely to cause the Commission staff to commence an examination, open an investigation, reopen an investigation that the Commission had closed, or to inquire concerning different conduct as part of a current examination or investigation, and the Commission brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of the whistleblower's original information; or

(k)    **Original information.** The phrase "original information" means information that—

    (1)    Is derived from the independent knowledge or independent analysis of a whistleblower;

    (2)    Is not already known to the Commission from any other source, unless the whistleblower is the original source of the information;

    (3)    Is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information; and

    (4)    Is submitted to the Commission for the first time after July 21, 2010 (the date of enactment of the Wall Street Transparency and Accountability Act of 2010).

    (5)    Original information shall not lose its status as original information solely because the whistleblower submitted such information prior to October 24, 2011, provided such information was submitted after July

IV

21, 2010, the date of enactment of the Wall Street Transparency and Accountability Act of 2010. In order to be eligible for an award, a whistleblower who submits original information to the Commission after July 21, 2010, but prior to October 24, 2011, must comply with the procedure set forth in § 165.3(d).

(l)     **Original source.** The whistleblower must satisfy the whistleblower's status as the original source of information to the Commission's satisfaction.

(1) Information obtained from another source. The Commission will consider the whistleblower to be an "original source" of the same information that the Commission obtains from another source if the information the whistleblower provide satisfies the definition of original information and the other source obtained the information from the whistleblower or the whistleblower's representative.

(i)  In order to be considered an original source of information that the Commission receives from Congress, any other federal, state or local authority, a foreign futures authority, any registered entity, registered futures association, or any self-regulatory organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)), the whistleblower must have voluntarily given such authorities the information within the meaning of this part. In determining whether the whistleblower is the original source of information, the Commission may seek assistance and confirmation from one of the other entities or authorities described in this paragraph (l)(1)(i).

(ii)  In the event that the whistleblower claims to be the original source of information that an authority or another entity, other than as set forth in paragraph (l)(1)(i) of this section, provided to the Commission, the Commission may seek assistance and confirmation from such authority or other entity.

## 17 C.F.R. § 165.5(a)

(a)     Subject to the eligibility requirements described in this part, the Commission will pay an award to one or more whistleblowers who:

(1) Provide a voluntary submission to the Commission;

(2) That contains original information; and

(3) That leads to the successful resolution of a covered judicial or administrative action or successful enforcement of a Related Action or both;

## 17 C.F.R. § 165.7(f)(1)-(2); (k)

(f)

(1) In connection with each individual covered judicial or administrative action or final judgment in a Related Action, for which an award application is submitted, once the time for filing any appeals of the covered judicial or administrative action or the final judgment in the Related Action has expired (or, where an appeal is filed of the covered judicial or administrative action, or the final judgment in a Related Action, as applicable, and concluded), the Claims Review Staff designated under § 165.15(a)(2) will evaluate all timely whistleblower award claims submitted on Form WB–APP in response to a Notice of Covered Action, referenced in paragraph (a) of this section, or final judgment in a Related Action in accordance with the criteria set forth in this part.

(2) The Whistleblower Office may require that the claimant provide additional information relating to the claimant's eligibility for an award or satisfaction of any of the conditions for an award, as set forth in § 165.5(b)(2). The Whistleblower Office may also request additional information from the claimant in connection with the claim for an award in a Related Action to demonstrate that the claimant directly (or through the Commission) voluntarily provided the governmental agency, regulatory authority or self-regulatory organization the original information that led to the Commission's successful covered action, and that the information provided by the claimant led to the successful enforcement of the Related Action. The Whistleblower Office may also, in its discretion, seek assistance and confirmation from the other agency in making this determination.

VI

(k)    A Preliminary Determination, Proposed Final Disposition, or a Proposed Final Determination may be issued only after a review for legal sufficiency by the Office of the General Counsel.

## 17 C.F.R. § 165.13(a)

(a)    Any Final Order of the Commission relating to a whistleblower award determination, including whether, to whom, or in what amount to make whistleblower awards, may be appealed to the appropriate court of appeals of the United States not more than 30 days after the Final Order of the Commission is issued, provided that administrative remedies have been exhausted.

## 17 C.F.R. § 165.15(a)(2)

(a)    Specific authorities—

. . . .

(2) **Designation of claims review staff.** The Claims Review Staff referenced in § 165.7 shall be composed of no fewer than three and no more than five staff members from any of the Commission's Offices or Divisions (except the Office of the General Counsel) who have not had direct involvement in the underlying enforcement action, as designated by the Director of the Division of Enforcement in consultation with the Executive Director. The Claims Review Staff will always include at least one staff member who does not work in the Division of Enforcement.